139 F.3d 901
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Glen Hollow PARTNERSHIP, an Illinois General Partnership on
behalf of the Big Hollow Land Trust Under Trust Agreement
No. 77-6096-00-0, and GHSC Associates Limited Partnership,
as successor in interest to the Glen Hollow Partnership, an
Illinois General Partnership on behalf of the Big Hollow
Land Trust Under Trust Agreement No. 77-6096-00-0,
Plaintiffs-Appellees,
v.
WAL-MART STORES, INCORPORATED, a Delaware corporation,
Defendant-Appellant.
 No. 97-1433, 97-1510.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 16, 1997.
Decided Feb. 26, 1998.
Rehearing Denied April 20, 1998.
 
 Appeal from the United States District Court for the Central District of Illinois. No. 91 C 1366 Joe B. McDade, Judge.
 Before Hon. RICHARD D. CUDAHY, Hon. JOEL M. FLAUM, Hon. DANIEL A. MANION, Circuit Judges.
 
 ORDER
 
 1
 Wal-Mart hired GHSC to construct a building which Wal-Mart would then lease, but GHSC failed to build on time. That prompted Wal-Mart to terminate the lease and GHSC to sue Wal-Mart for breach of contract. A jury sided with GHSC. Wal-Mart appeals. We reverse and remand for a new trial.
 
 I. Background
 
 2
 In 1987, Glen Hollow (the predecessor of GHSC) and Wal-Mart began discussing the development of a shopping center in Peoria, Illinois. Late in 1987, Glen Hollow, through its principal David Joseph, sought rezoning of property located at Glen and Big Hollow roads in Peoria, to allow for the construction of the shopping center. While the rezoning process with the City of Peoria was pending, Glen Hollow entered into a lease with Wal-Mart which required Glen Hollow to construct a 110,580 square foot building on the site which Wal-Mart would rent at the annual rate of $4.00 per square foot. Glen Hollow also entered into a similar lease with Sam's Club.
 
 
 3
 In December 1988, the City of Peoria rezoned 39 acres at Glen and Big Hollow roads, but by January 1989 neighboring residents had filed a lawsuit challenging the City's rezoning of the property. In June 1989, after there was no progress on the shopping center, Wal-Mart and Sam's Club notified Glen Hollow that they were terminating their leases. Following negotiations, Wal-Mart agreed to stay at the site, while Sam's Club moved to another location.
 
 
 4
 In July 1989, an Illinois trial court upheld the City of Peoria's rezoning of the property. Opponents to the rezoning appealed to the Illinois Appellate Court. While that appeal was pending, on November 13, 1989, Wal-Mart and Glen Hollow signed an amended lease which required Glen Hollow to construct a 114,557 square foot building which Wal-Mart would lease at the annual rate of $4.84 per square foot. The lease provided that construction would begin by March 15, 1990 and that Wal-Mart would obtain possession by October 15, 1990. However, the lease also provided that "[t]he above dates shall be extended if Lessor's performance is delayed by governmental regulations, civil riot, or unusually severe weather conditions."
 
 
 5
 In May 1990, the Illinois Appellate Court upheld the trial court's decision validating the City of Peoria's rezoning of the property. The neighboring property owners sought review of the Appellate Court's decision by the Illinois Supreme Court, but on October 3, 1990, the Illinois Supreme Court denied the plaintiffs' petition for review.
 
 
 6
 While the zoning litigation and the appeals were pending, Glen Hollow began laying the footing in February 1990, but that is the only construction activity that ever took place. After the litigation ended, Glen Hollow did not engage in any further construction at the site. More than six months after the Illinois Supreme Court denied review, Glen Hollow had yet to begin construction (and in fact had informed Wal-Mart that it would still take several months before it could proceed with construction). In a letter to Glen Hollow dated April 4, 1991, Wal-Mart stated that it was terminating the lease because Glen Hollow had not begun construction and had not diligently continued with construction.
 
 
 7
 In response, Glen Hollow (actually GHSC, Glen Hollow's successor in interest, but for simplicity's sake, we will continue to refer to it as Glen Hollow) sued Wal-Mart, alleging among other things, breach of the lease agreement. Wal-Mart moved for judgment as a matter of law on the breach of lease count. The district court denied this motion, and following the jury's $2.2 million verdict, Wal-Mart renewed its motion which the court also denied. The district court then entered judgment in favor of Glen Hollow in the amount of $2.2 million. Wal-Mart appeals, contending that the district court erred in denying its motions for judgment as a matter of law, and, alternatively, that numerous errors justify a new trial.
 
 II. Analysis
 
 8
 This court reviews de novo the district court's denial of a motion for judgment as a matter of law. DeBasio v. Illinois Cent. R.R., 52 F.3d 678, 682 (7th Cir.1995). We must determine "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed." Haley v. Gross, 86 F.3d 630, 632 (7th Cir.1996).
 
 
 9
 At issue in this case is a very narrow question based on Paragraph 5 of the lease, which provides:
 
 
 10
 Lessor shall commence construction of the Demised Premises before March 15, 1990, and shall diligently proceed thereafter. If Lessor should fail to commence and be diligently proceeding with construction, Lessee shall have the right and privilege to terminate this Lease without any liability. The words "commence construction" as used herein means the completion of foundation footings of the Demised Premises. It is agreed by the parties that the timely possession of the Demised Premises is a material inducement to the Lessee's execution of this Lease and that the date of possession agreed upon by the parties shall be no later than October 15, 1990, subject to the herein force majeure provisions. The above dates shall be extended if Lessor's performance is delayed by governmental regulations, civil riot, or unusually severe weather conditions.
 
 
 11
 The issue before us is whether Wal-Mart had the right to cancel the lease under paragraph 5. Although the lease required Glen Hollow to begin construction by March 15, 1990 and "diligently proceed thereafter," it also provided that the date "shall be extended if Lessor's performance is delayed by governmental regulations ..." The evidence presented at trial established that Glen Hollow's performance was initially delayed because of the zoning litigation and that this constituted "governmental regulations." Such litigation likely qualifies as "governmental regulations," but the evidence also established that the zoning litigation concluded on October 3, 1990 when the Illinois Supreme Court refused to review the lower court's decision.[1] There is no evidence that these governmental regulations delayed construction after that time. Rather, the evidence established that Glen Hollow did not begin construction because it was unable to obtain financing for the project. There is not even any evidence in the record that governmental regulations delayed Glen Hollow's ability to obtain financing after October 15, 1990. Rather, the evidence established that Glen Hollow was unable to obtain financing because of the company's internal financial difficulties.
 
 
 12
 Glen Hollow argues that after the zoning litigation ended it had a reasonable time in which to begin construction, and that a jury could reasonably conclude that the time had not yet expired when Wal-Mart terminated the lease in April 1991. In support of its position, Glen Hollow cites to six transcript pages (of the more than 1,000 page record).
 
 
 13
 First, Glen Hollow's brief points to testimony by Wal-Mart's Tom Seay that "an average time frame from development of a store was 15-16 months, though that time span may be longer in localities where winter weather is a factor. He also admitted that some developments take longer, as long as five or six years." Glen Hollow also points to the timing for construction under the original lease:
 
 
 14
 Consider the time allocated by Wal-Mart when it first committed to the Glen Hollow site. The Letter of Intent was issued on January 11, 1988. The purpose of the letter was to, among other things, locate the necessary financing for the construction. Construction was not to commence under the original lease until March 15, 1989; thus the time to locate financing and commence construction was 14 months. It was recognized that it was impossible to obtain financing while the zoning ordinance was under attack in the appellate court.
 
 
 15
 Based on Seay's testimony and the terms of the original lease, Glen Hollow argues that six months was not a sufficient time for it to begin construction because it normally takes longer than that to obtain financing.
 
 
 16
 This argument digresses from the issue before us. Under the amended lease Glen Hollow was required to begin construction on March 15, 1990. The only condition that would extend that date was delay caused by governmental regulations (or civil riot or severe weather conditions--neither of which are at issue here). See Kel Kim Corp., Central Markets, Inc., 70 N.Y.2d 900, 524 N.Y.S.2d 384, 385, 519 N.E.2d 295 (N.Y.1987) (force majeure clause covers only those situations specified therein). The specific condition spelled out was governmental regulations, which logically include zoning delays. Once the governmental regulations no longer delayed performance, Glen Hollow would have a reasonable extension of time to perform. Restatement (Second) of Contracts § 269 comment a ("Temporary impossibility [such as delay beyond the control of either party] merely extends the duty of performance until the impossibility ceases."); Culp v. Tri-County Tractor, Inc., 112 Idaho 894, 736 P.2d 1348, 1354 (Id.App.1987). Where the circumstances giving rise to the impossibility cease to exist, a party is entitled to an appropriate extension of time for performance. Restatement (Second) of Contracts § 269 comment a. Here, any delay in beginning construction must be both directly and proximately caused by the zoning delays. Northern Ill. Gas Co. v. Energy Coop. Inc., 122 Ill.App.3d 940, 78 Ill.Dec. 215, 461 N.E.2d 1049 (Ill.App.1984) (delay in performing contractual duty must be proximately caused by event contemplated by the force majeure clause of the contract.). See also, City of Valdez v. Valdez Devel. Co., 523 P.2d 177 (Ala.1974) (accord).
 
 
 17
 The evidence does not show that Glen Hollow's inability to begin construction was proximately caused by governmental regulations. Rather, the evidence Glen Hollow relies upon indicates that it did not start construction because it did not have construction financing. As discussed below, the evidence shows that a significant reason for the financing problems was the serious financial problems incurred by Joseph's partner, Dellaportas. As Joseph indicated, Dellaportas became a negative rather than a positive in the short-term financing picture. While this excuse may seem reasonable, it was not a legitimate excuse under the contract. The zoning litigation was resolved. Any further delay in obtaining construction financing was not proximately caused by governmental regulation--the only type of delay which would excuse Glen Hollow's untimely performance. Glen Hollow not only presented no evidence of governmental regulations that prevented it from beginning construction; it also did not show that such regulations prevented it from obtaining financing for the six-month period between October and March, and financing delays were not covered in the contract anyway. The sparse portions of the record Glen Hollow cites do not establish, or even create an inference, that governmental regulations delayed its ability to begin construction beyond October of 1990. The evidence cited instead points to financial problems with the partnership--problems that certainly can cause unfortunate delays, but problems not absolved by any terms of the contract.
 
 
 18
 But we have not stopped with the evidence underscored by Glen Hollow--we have reviewed the entire record to discern any evidence which a jury could reasonable rely upon to conclude that government regulations delayed Glen Hollow's start of construction. This record consists of more than 1,000 pages of transcripts, five volumes of pleadings and hundreds of trial exhibits. To some degree it reads like a how-to book ("How to Commercially Develop Land in Peoria "). While this much evidence would normally elucidate a complex contract case, here it did just the opposite--it complicated a rather straightforward case, perhaps confusing the jury. Even after thoroughly reviewing the record, we cannot find any evidence supporting Glen Hollow's position that governmental regulations delayed the beginning of construction; rather, the record establishes the contrary--that governmental regulations did not delay the beginning of construction after October 1990.
 
 
 19
 Specifically, the record establishes that even though the zoning appeal was completed, Joseph had difficulty getting financing because of Glen Hollow's own financial problems. This financial hurdle, not governmental regulations, is what prevented Glen Hollow from beginning construction. For example, in December 1990, Joseph wrote Wal-Mart and stated that there were "no further legal impediments to ... proceeding" but his only difficulties at that point were financial. The record contained further evidence that Joseph's partner, Dellaportas, who was to provide financial backing, was not only unable to provide such financing but instead had become a financial liability. As a December 1990 letter explained: "One of the primary reasons for difficulties now facing the project is Jim Dellaportas' financial problems." In fact, Joseph's attorney wrote in December 1990 that no lender would touch the project while Dellaportas was involved. The record also contains evidence that Joseph was willing to transfer the property to Wal-Mart under a sale-buy-back transaction and if Wal-Mart agreed to this transfer, Glen Hollow could begin construction immediately. (That's because of "the terrific financial statement of Wal-Mart; it would attract lenders to lend money quicker...." ) While that arrangement may have been a viable alternative, it was a complete departure from the written contract. By January 1991, Joseph was telling Wal-Mart that in order to obtain financing the rental value must be increased. These are just samples; the record is replete with additional evidence that establishes that the reason Glen Hollow did not begin construction was because it did not obtain financing until (at the earliest) just days before Wal-Mart terminated the lease. The record shows that Glen Hollow did not proceed with construction as required by the contract because it was unable to obtain financing during the six months following the zoning litigation because of its own financial difficulties.
 
 
 20
 Thus the jury verdict cannot stand. Glen Hollow has presented no evidences establishing its inability to obtain financing nor has it shown that the delay in beginning construction was proximately caused by the zoning litigation. But while we must set the jury verdict aside, we also conclude that a new trial on liability is warranted. At trial the jury was instructed that "Plaintiff was entitled to a reasonable extension of time after performance was no longer delayed by governmental regulations to commence and diligently proceed with construction." While not inaccurate, this instruction is incomplete because its fails to inform the jury that the delay must be directly and proximately related to the force majeure event--the governmental regulations or zoning litigation. True, Wal-Mart did not object, nor as far as we can tell propose a more detailed instruction. But in reviewing a judgment as a matter of law, we must apply the correct law, not the law on which the jury was instructed. Geldermann Inc. v. Financial Mgt. Consultants, Inc. ., 27 F.3d 307, 313 (7th Cir.1994). Under the correct law, and on this record, Glen Hollow cannot win. But because the parties incorrectly focused on the reasonableness of the time without consideration of the cause of the delay, we remand this case for a new trial so that Glen Hollow has an opportunity to present evidence that the delay in obtaining financing was proximately caused by the zoning litigation. See Matter of Taxman Clothing Co. Inc., 905 F.2d 166, 171 (7th Cir.1990) ("[R]emanding for a new trial would be proper if there were insufficient evidence at the original trial to decide who should prevail under the correct legal standard, and if the insufficiency could not be laid at the door of the party having the burden of proof.")[2]
 
 
 21
 Wal-Mart also appealed the damage award, presenting numerous arguments. Normally we would not reach this issue because we are reversing on liability. But because Glen Hollow claims that the district court erred in excluding evidence concerning a liquidated damage clause, it would be prudent to address the claims in order to avoid similar problems on remand. Before discussing this and the other issues presented, however, we must first understand Glen Hollow's damage theory.
 
 
 22
 When Wal-Mart pulled out of the lease other potential lessees refused to go through with their leases. Without these leases Glen Hollow was unable to obtain construction financing and therefore was unable to complete construction of the Glen Hollow shopping center. This forced Glen Hollow to sell off parcels of land to purchasers such as Target. Glen Hollow claims that it is entitled to damages representing the difference between (1) the value of the completed shopping center it would have owned had Wal-Mart not pulled out from the project (estimated by the value of the now completed Target center); and (2) the sum of the proceeds Glen Hollow received from selling the property; the value of the property Glen Hollow retained; and the construction costs that Glen Hollow would have incurred had it built the shopping center.
 
 
 23
 Wal-Mart argues that this damage theory is too speculative and uncertain. Damages are recoverable only if proven "to a reasonable degree of certainty, and the evidence cannot be removed, speculative or uncertain." Northwest Comm. Bank v. Continental Data Forms, Inc., 233 Ill.App.3d 124, 174 Ill.Dec. 249, 598 N.E.2d 446, 450 (Ill.App.1992). Moreover, the general rule is that an unestablished business will be unable to provide competent proof of lost profits to a reasonable certainty. SK Hand Tool Corp. v. Dresser Indust., Inc., 284 Ill.App.3d 417, 219 Ill.Dec. 833, 672 N.E.2d 341, 348 (Ill.App.1996). We agree with Wal-Mart--Glen Hollow's damage theory is just too speculative. Because the project completed for Target is materially different from the Wal-Mart shopping center contemplated by Glen Hollow, it is too speculative to conclude that the Target shopping center's value approximates the hypothetical value of the Wal-Mart shopping center; whether the Wal-Mart center would ever have been completed even with Wal-Mart as an anchor tenant is also too uncertain to support Glen Hollow's damage theory.
 
 
 24
 Glen Hollow's damage theory fails for a second reason: The Wal-Mart contract contained a liquidated damage clause. Paragraph 17 provided that if Wal-Mart:
 
 
 25
 shall default in the performance of any other covenant, agreement, condition, rule or regulation herein obligating Lessee... Lessor shall relet the Demised Premises or any part thereof as the agent of Lessee, with Lessee remaining liable to pay Lessor Minimum Rent and other charges reserved herein (but not Percentage Rent) for the balance of the term, less the reasonable market rental value of the Demised Premises for the same period; ... Should the reasonable rental value of the Demised Premises be less than the Minimum Rent, Lessee shall pay such deficiency on a monthly basis.
 
 
 26
 If a jury determines that Wal-Mart's withdrawal from the lease was a breach of contract, it would trigger the liquidated damage provision. In that event Glen Hollow's damages are limited to those agreed upon by the parties in that paragraph.
 
 
 27
 The district court refused to instruct the jury on paragraph 17 and prohibited Wal-Mart from presenting evidence as to the fair rental value of the premises. The district court reasoned that paragraph 17 was inapplicable because it contemplates that the building had already been constructed and that the lease had commenced. But that conclusion is contrary to the plain language of paragraph 17 which provides for liquidated damages when the lessee "defaults under any agreement under the Lease." This of course would include an anticipatory breach of lease.
 
 III. Conclusion
 
 28
 The lease agreement provides that construction must begin on March 15, 1990 and diligently proceed thereafter. Glen Hollow did not begin construction as required under the lease before that date. And while the contract provided that the time for performance will be extended if"delayed by governmental regulations," there is absolutely no evidence that governmental regulations delayed the beginning of construction beyond October 1990, when the Illinois Supreme Court denied the property owners' petition for review. Accordingly we REVERSE the jury's verdict. However, because the issue was not appropriately framed at the trial court level, we REMAND this case for a new trial. The damage theory originally presented to the jury was too speculative and because damages are limited to those specified in the liquidated damage clause of the contract, on remand the jury should be instructed accordingly.
 
 
 29
 CUDAHY, Circuit Judge, concurring in part and concurring in the judgment.
 
 
 30
 The question what is required here to establish liability is difficult, and if these difficulties create a need for a new trial I would follow a somewhat different approach than the majority. Thus, on the issue of liability, Northern Illinois Gas Co. v. Energy Co-op., 122 Ill.App.3d 940, 78 Ill.Dec. 215, 461 N.E.2d 1049, 1058 (Ill.App.Ct.1984), addresses only the question, not disputed by the parties, whether Glen Hollow was excused from performance during the zoning litigation--not the question how long Glen Hollow had to commence and diligently proceed with construction once appeals were exhausted. The plaintiff in a breach of contract case, however, must educate the jury on what constitutes a reasonable extension of time--here, to commence construction. See Wilmette Partners v. Hamel, 230 Ill.App.3d 248, 171 Ill.Dec. 657, 594 N.E.2d 1177, 1186 (Ill.App.Ct.1992). Glen Hollow counters that it was not required to produce expert testimony on the issue of what constitutes a reasonable extension of time, but the problem seems to be that it did not present any other evidence on this point. The evidence Glen Hollow presented on the time it would take to complete construction after it commenced construction is not relevant to the question of when construction should have begun.
 
 
 31
 In my view, Glen Hollow might have presented evidence showing that any competent developer would have been delayed for a comparable period after the zoning litigation was resolved. By itself, Glen Hollow's extended description of the problems it actually encountered provides an inadequate standard for comparison. The district court suggested that the jury could have determined reasonableness from the dates in the original and amended lease agreements and various memoranda between the parties. But these documents do not necessarily illuminate what constituted a reasonable time period following the conclusion of the zoning litigation. The evidence needed to inform the jury about reasonableness "in light of the conditions [the plaintiff] encountered." Id.
 
 
 32
 This court's instructions to the district court on remand will, in effect, require Glen Hollow to present evidence on the reasonableness of the delay under the circumstances the plaintiff encountered--the conclusion of the zoning litigation. With respect to damages, I would allow testimony and argument on paragraph 17; I would not at this point conclude that it was determinative.
 
 
 
 [1]
 On appeal, Glen Hollow attempts to extend the time of delay caused by the litigation until the time under which the neighbors could have filed for certiorari in the Supreme Court. Not only did the property owners not seek review by the United States Supreme Court, but in the words of GHSC's own attorney, it was "very, very, very, remote" that the Supreme Court would grant cert. Moreover, there is no evidence that the ability to petition for certiorari in any way delayed Glen Hollow's ability to obtain financing
 
 
 [2]
 On remand, to prevent any further confusion the district court should follow his own advice and better monitor the evidence admitted. As he recognized during the first trial, much of the evidence was irrelevant and had nothing to do with the issue of the case